James **WILLIAMS**, Jr., By His Guardian ad Litem, Henry H. Sink, Plaintiff,

v.

The **STANDARD SUPPLY COMPANY,** Inc., Defendant.

Civ. No. 2101.

United States District Court,
E. D. North Carolina,
Raleigh Division.

April 17, 1970.

Ronald C. Dilthey, Grady S. Patterson, Jr., Teague, Johnson, Patterson, Dilthey, & Clay, Raleigh, N. C., Harry R. Schwartz, New York City, for plaintiff.

W. C. Harris, Jr., W. Brian Howell, Harris, Poe, Cheshire & Leager, Ted R. Reynolds, Reynolds & Farmer, Raleigh, N. C., for defendant.

## MEMORANDUM DECISION

KELLAM, District Judge.

On August 26, 1960, James Williams, Jr., then an infant ten months of age, was injured in a collision between an automobile in which he was riding, driven by his father, James Williams, Sr., and a truck of Standard Supply Company, Incorporated (Standard), driven by Pete O. Williams, Jr. (Pete). Suit on this claim was not instituted until March 8, 1968.

The events leading up to the accident and injury are these:

Pete O. Williams, Jr. had been a truck driver for Standard for some 28 years. He had a perfect record, had never been involved in an accident, and had never been issued a ticket for a traffic violation. The International truck which he was driving was described by him as being in "perfect" condition. He was the only person who drove this particular truck.

On the morning of August 26, 1960, Pete left Raleigh with a load of plumbing and heating supplies. He made deliveries in Wake Forest, Franklinton, Louisburg and Henderson, and was on his way back to Raleigh.

At the same time James Williams (James), father of the infant plaintiff, was on his way from Brunswick, Georgia, to Brooklyn, New York. He was driving his 1956 Buick. His wife was

asleep on the rear seat, and his stepson, Melvin Slaughter, was riding on the front seat holding the infant plaintiff in his lap. They left Brunswick, Georgia, about 11:00 p.m. on August 25th, and had been driving continously for about sixteen hours, except for short stops to rest and to eat. James was the only one authorized to drive, and did all of the driving. Shortly before the accident they had stopped in a picnic area for lunch. Since it was raining, they remained in the car while eating.

The highway at the scene of the accident was divided into two lanes of the approximate width of eleven feet each. The area was open country, and slightly hilly. It had been and was then raining. The posted speed was 55 miles per hour for passenger cars and 45 miles per hour for trucks. The highway was either asphalt or other hard-surface material.

At about 2:45 p.m. on August 26th, Pete was proceeding south on U.S. 1, about two miles out of Kittrell, North Carolina, driving in his right hand lane (west lane). The parking lights on the truck were burning and the windshield wipers operating. There were no vehicles ahead of or behind him in his right lane, within the sight of his vision. After he came over the crest of a hill he observed a Buick about two or three hundred yards ahead proceeding north on U. S. 1 (meeting him). The Buick was coming down a hill approaching a slight curve to the right. After the Buick came out of the curve, its two right wheels went off the edge of the hard surface and travelled along the shoulder of the road for a distance of about fifty feet before coming back on the hard surface. As the Buick came back on the hard surface, it ran or skidded diagonally across the highway at a high speed,[1] and into the truck. The truck at all times remained in its right lane. The truck driver said that when the Buick went off the edge of the hard

surface, he fully expected it to pull back on the road and continue along its proper side of the highway; that he had no reason to believe it would cross over to the truck's side of the road; that when he realized the Buick was skidding toward, him, he did not have time to apply his brakes, but he did try to pull his truck to the right.

Following the collision the truck came to rest with its front end on the edge of the hard surface of the right lane for southbound traffic (west lane) headed east, and its rear over in the ditch. The Buick was south of the truck, facing west, with its rear end on the hard surface of the west lane (its left hand lane) and the front wheels on the shoulder. The damage to the truck was on the entire front, front fenders, wheels, radiator and frame; the front wheels were knocked to their left (toward the west) and the damage to the fenders and frame was from the left to the right side of the truck. The Buick suffered damage to the right front fender, the hood, radiator and both doors on its right side. The debris was all found in the center of the southbound lane (west lane). There were no skid marks, but the state trooper said he could trace the trail of the "mud marks" of the Buick from about where the car returned to the hard surface from the shoulder of the road up to where he found the debris. The vehicles were about 390 feet from the crest of the hill to the north— the hill over which the truck had come.

There was sharp conflict between the testimony of Melvin Slaughter, half-brother of the infant plaintiff, on the one hand, and the testimony of Pete Williams, the truck driver, and the state trooper who investigated the accident, on the other hand. Slaughter was 27 years old at the time of trial [November 17, 1969], hence was about 18 years old at the time of the accident. He was knocked unconscious at the time of im-

---

1. Later, the witness, when asked to state the speed, said again "high speed." On motion, this was stricken. However, there was no objection to the first statement and it remained as a part of the record. See Tr. of Ev. pp. 280 and 282.

pact and did not regain consciousness until he was in the hospital. He did not view the scene from the date of the accident until the week of May 20, 1969, and again in November, 1969.[2] He testified that the Buick ran off the edge of the hard surface of the highway "in the crest of the curve * * * the center of the curve;" that the driver did not apply his brakes until all four wheels of the car were back on the hard surface; that the Buick "gradually began to slide and we slid gradually to the westward side or the middle of the highway;" that the Buick travelled 200 feet while it was sliding on the highway; that the car came to a stop at a 90 degree angle across the highway, going west; that after the Buick stopped he looked to his right, and some 1500 feet to the north he saw defendant's truck coming over the crest of a hill; that it disappeared in the valley between that hill and the hill nearer him; that he saw it as it came over the crest of the hill nearest him; that it did not change its course or speed, but ran into the right front of his car. He did not remember what his father was doing all this time while the Buick was stopped across the highway, whether the motor had stalled or whether his father was trying to start the motor. He felt the speed of the truck was 50 to 60 miles per hour.

James Williams, driver of the Buick, did not testify. His whereabouts are unknown. His family has not heard from him for some six years.

Melvin Slaughter testified that after the Buick slid to a stop, he looked north along the highway and saw the defendant's truck some 1500 feet away coming over the crest of the second hill in the distance. The state trooper testified that from the scene of the impact one could not see a truck at the second hill in the distance.

Resolving all conflicts in the evidence, it establishes that the Buick skidded across the highway when the truck was dangerously near and this was the sole proximate cause of the collision. At all times defendant's driver was proceeding on his right side of the highway at a lawful speed, but even if he was exceeding a lawful speed, such was a remote and not a proximate cause of the accident. The explanation made by Pete Williams is supported by the physical facts. The Court was much impressed with him, with his manner, his sincerity, his demeanor, his straightforwardness, and the reasonableness of his testimony.[3] Not only did he say the Buick was moving at a high speed at time of impact, but the damage to the vehicles, the positions of the cars after impact, and the other facts support him. These physical facts speak loudly. Mayberry v. Allred, 263 N.C. 780, 140 S.E.2d 406, 408.

The seriousness of the plaintiff's injury cannot be disputed. It is tragic that so young a life is completely shattered and the promise of a future so nearly extinguished. While everyone would be moved in pity and compassion at his plight, he cannot recover unless there is negligence on the part of the defendant which was a proximate cause of the accident. Daily we charge the jury that its verdict must not be founded upon sympathy for either of the parties. We find it is easier to say than to apply.

■ Here there is no issue of contributory negligence. Plaintiff was only ten months old. Under the law of North Carolina an infant "under seven years of age is conclusively presumed to be incapable of contributory negligence." Welch v. Jenkins, 271 N.C. 138, 155 S. E.2d 763.

■■ No presumption of negligence arises from the mere happening of an

---

2. Pete Williams was quite familiar with the area, as was the state trooper, who patrolled this highway for 10 years.

3. The Court was advised on the day of trial that Pete Williams is suffering from

an illness from which he could not recover, and that he probably had only a few weeks to live. Williams was aware of this fact. His testimony had been previously taken and preserved for use in the event he was unable to appear.

accident and injury. To establish actionable *negligence plaintiff must show* that there has been a failure to exercise proper care in the performance of some legal duty owed by one to another in the circumstances of the case, and that the breach of such duty was a proximate cause of the accident and injury; that is, a cause that produced the result in continuous sequence and without which it would not have happened, and one from which a person of ordinary prudence could have foreseen that such a result was probable under all the facts as they existed. Jones v. C. B. Atkins Co., 259 N.C. 655, 131 S.E.2d 371; Johns v. Day, 257 N.C. 751, 127 S.E.2d 543; Heuay v. Halifax Const. Co., 254 N.C. 252, 118 S.E.2d 615; Henderson v. Henderson, 239 N.C. 487, 80 S.E.2d 383, 385.

■ From the credible evidence in this case there is no doubt that the driver of the Buick automobile was guilty of negligence which was a proximate cause of the accident.[4] The issue is, was it the sole cause of the accident? That is, does a preponderance or greater weight of the evidence establish that defendant *was also guilty of negligence which* proximately contributed to cause or concurred in producing the accident and injury? If so, then plaintiff is entitled to recover, even though the driver of the Buick car was guilty of more or a greater degree of negligence than defendant. Liability is not determined by the amount or proportions of one's negligence.

■ It was the duty of each driver to keep to his right and yield to the other one-half of the main travelled portion of the highway as nearly as possible. Lucas v. White, 248 N.C. 38, 102 S.E. 2d 387. The law of North Carolina is well settled that the driver of an automobile who is himself observing the law in meeting and passing an automobile proceeding in the opposite direction has the right ordinarily to assume that the driver of the approaching automobile will also observe the rule and avoid a collision. Morgan v. Saunders, 236 N.C. 162, 72 S.E.2d 411, 412; Hoke v. Atlantic Greyhound Corporation, 227 N.C. 412, 42 S.E.2d 593; Lucas v. White, 248 N.C. 38, 102 S.E.2d 387. Neither driver is under a duty to anticipate the other will violate the rule. When the driver of one of the vehicles is not observing this rule, as the vehicles approach, the driver of the other vehicle may assume that before the vehicles meet, the driver of the approaching vehicle will turn to his right so that the vehicles may pass in safety. Such driver has the right to rely upon such assumption up to the moment the contrary appears, or in the exercise of ordinary care, should have appeared. Morgan v. Saunders, supra; Henderson v. Henderson, supra.

■ A motorist, although on his proper side of the highway, has the duty to avoid colliding with another vehicle which comes into his path from the opposite direction "if he can do so in the exercise of due care." From the moment the motorist "sees or in the exercise of ordinary care should see that the approaching driver cannot or will not *return to his side of the road, it is encum-* bent upon him to exercise due diligence under the conditions then existing to prevent an accident." When reasonably possible, it is his duty to "slow down, turn from a direct line, drive off the highway, stop, or take such other evasive action as a person of ordinary prudence would take under similar circumstances *to avoid a collision.*" Forgy v. Schwartz, 262 N.C. 185, 136 S.E.2d 668, 671. If he neglects to do so and such failure is a proximate contributing cause of the accident, he is liable as a joint tortfeasor to those injured as a consequence of his negligence. Forgy v. Schwartz, supra; Jones v. C. V. Atkins Co., supra; Redden v. Bynum, 256 N.C. 351, 123 S.E.2d 734.

Here, the driver of the car in which the infant plaintiff was riding ran off the edge of the highway, travelled on the shoulder for approximately 50 feet,

---

4. The rear tires on the Buick were slick—that is, without tread.

returned to the highway and then ran or slid over into the path of the oncoming truck. Melvin Slaughter, plaintiff's witness, in describing the action said after all four wheels of the Buick returned to the highway, the driver applied brakes and the car "began to gradually slide" and it slid along the highway over into the path of the oncoming truck of the defendant, where the collision occurred.[5] Until the defendant's driver saw that the Buick was coming over on his side of the road, or in the exercise of ordinary care should have seen or reasoned it was coming over to his side of the road, there was no reason for him to take any precautionary action. Defendant had the right to assume the driver of the Buick would remain on his side of the highway until the contrary appeared, or in the exercise of ordinary care should have appeared. From Slaughter's testimony, the Buick was not travelling at an excessive speed, the car did not appear out of control, had all four wheels back on the hard surface before the brakes were applied, and the sliding was gradual and at a slight angle.

When defendant's driver saw the Buick car come back on the highway and thereafter start to slide towards its left side of the highway, he said it was so quick that when he realized what was happening, he did not have time to apply his brakes. He was then travelling at a lawful speed on his own side of the highway. Thus confronted with a sudden emergency not of his own making, he is not held to the same degree of deliberation and circumspection as under ordinary conditions. He is not held by the law to make the wisest choice of action, but only such choice as a person of ordinary prudence similarly situated would have made. Forgy v. Schwartz, supra; Jones v. C. B. Atkins Co., supra; Henderson v. Henderson, supra; Morgan v. Saunders, supra. The de-

fendant's driver "might well have concluded that the safest course was to remain in his proper lane of travel under the assumption that the other driver would observe the law in time to pass in safety, rather than attempt to change the situation by a sudden turning." Morgan v. Saunders, supra [72 S.E.2d 413]. The language of the Court in Forgy v. Schwartz, at page 672 [136 S. E.2d 672] is particularly appropriate here:

> The law recognizes that the sudden appearance of an automobile, speeding toward a driver in his lane of travel, will create such excitement and apprehension of impending doom in the ordinary prudent man that it may paralyze his reactions or cause him to make an error of judgment. 7 Am. Jur.2d, Automobiles and Highway Traffic § 359. "Some allowance must be made for the excitement of the moment and strain on the nerves." Crowe v. Crowe, 259 N.C. 55, 129 S. E.2d 585. When "the unexpected occurs, time must be allowed a driver, put in peril without his fault, to appreciate the danger and form a judgment of how he will meet it." Torbert v. Smith's Estate, 250 Mich. 62, 229 N.W. 406.

The cases reveal that motorists who have been confronted by an automobile approaching in the wrong lane have, on occasions, (1) continued straight ahead, (2) turned to the right, (3) turned to the left, and (4) stopped. 8 Am.Jur.2d, Automobiles and Highway Traffic §§ 763–766. A lengthy annotation, Collision —Approaching Car—Wrong Lane, 47 A.L.R.2d 6, collects the cases. In applying the doctrine of sudden emergency, the courts have not been inclined to weigh in "golden scales" the conduct of the motorist who has acted under the excited impulse of sudden

---

5. Slaughter said the car slid along the highway for a distance of 200 feet (Tr. of Ev. p. 18). The highway was only 22 feet wide. If the Buick slid 200 feet in a straight line, as Slaughter said it did, it would have remained in its right lane for a distance of about 100 feet before crossing over into the left lane.

panic induced by the negligence of the other motorist.

and continuing, the Court said:

> According to the estimates of the Forgys, Mrs. Schwartz had a maximum of only five or six seconds in which to form a judgment and take evasive action. She probably had less than five seconds.

> It is rarely safe to predicate negligence solely on a strict mathematical computation of time, distance, and rate of speed for the problems of human conduct cannot be solved by reference to a slide rule. This is especially true when, as here, the measurements upon which they are based were made almost four years after the accident. The initial observations and estimates of the persons involved were necessarily made under great stress and apprehension—despite Mr. Forgy's measured description of his activities during the seconds which intervened between his discovery of the peril and the moment of collision.

> \* \* \* \* \* \*

> If we were to concede both a delayed reaction and an error of judgment on the part of Mrs. Schwartz when she was suddenly brought face to face with unexpected danger, it is our opinion that her conduct in the acute emergency did not constitute actionable negligence. The evidence fails to show that an ordinary prudent person would have reacted more quickly or used better judgment under the same circumstances. Jones v. C. B. Atkins Co., supra; Patterson v. Ritchie, 202 N.C. 725, 164 S.E. 117. The defendant Schwartz' motions for judgment as of nonsuit should have been allowed.

■ If we assume that when the Buick ran off the edge of the highway it was travelling at the rate of only 40 miles per hour, it would have been travelling approximately 60 feet per second. In less than five seconds it would have travelled the 50 feet along the shoulder of the road, back on the highway and along and across the highway for the 200 feet testified to by Slaughter. It is a relatively short period of time within which one who is observing the law may act to avoid an accident. If at a speed of 40 miles per hour the driver of the Buick could not bring his car under control and to a stop, how can we say the driver of the truck should have brought his vehicle to a stop in time to have avoided a collision.

Plaintiff has not carried the required burden of proof. On the contrary, the evidence establishes that the sole proximate cause of the accident was the negligence of the driver of the Buick automobile. The plaintiff is therefore not entitled to recover and the action is dismissed.